Rafey S. Balabanian (SBN 315962)
rbalabanian@edelson.com
EDELSON PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Telephone: 415.212.9300
Facsimile: 415.373.9435

Robert Teel (SBN 127081)
lawoffice@rlteel.com
LAW OFFICE OF ROBERT L. TEEL
1425 Broadway, Mail Code: 20-6690
Seattle, Washington 98122
Telephone: 866.833.5529
Facsimile: 855.609.6911

[Additional counsel appearing on signature page]
*Attorneys for Plaintiffs and the Proposed Classes*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENNIS MAGANA, SCOTT SWINDELL, and DAVID TOROSYAN, on behalf of themselves, and all others similarly situated, <br><br> *Plaintiffs,* <br><br> v. <br><br> ADTALEM GLOBAL EDUCATION, INC., formerly known as DEVRY EDUCATION GROUP, INC., a Delaware corporation, DEVRY UNIVERSITY, INC., a Delaware corporation, <br><br> *Defendants.* | Case No.: <br><br> <u>CLASS ACTION</u> <br><br> **COMPLAINT FOR:** <br><br> (1) **UNFAIR COMPETITION, CAL. BUS. & PROF. CODE §§ 17200,** *et seq.*; <br> (2) **FALSE ADVERTISING. BUS. & PROF. CODE §§ 17500,** *et seq.*; <br> (3) **FRAUD;** <br> (4) **CONCEALMENT;** <br> (5) **NEGLIGENT MISREPRESENTATION;** <br> (6) **BREACH OF CONTRACT;** <br> (7) **BREACH OF FIDUCIARY DUTY;** <br> (8) **CONVERSION; AND** <br> (9) **UNJUST ENRICHMENT** <br><br> <u>DEMAND FOR JURY TRIAL</u> |

## INTRODUCTION

1.     Plaintiffs Dennis Magana ("Magana"), Scott Swindell ("Swindell"), and David Torosyan ("Torosyan") individually and on behalf of all other persons similarly situated (individually and collectively referred to herein as "Plaintiff" or "Plaintiffs"), by their undersigned attorneys, file this Class Action Complaint against Adtalem Global Education Group, Inc., formerly known as DeVry Education Group, Inc. ("Adtalem"), and DeVry University, Inc. ("DVU") (collectively referred to as "Defendants" or "DeVry") to, without limitation, obtain damages and restitution as well as a declaration that Defendants' actions were unlawful as further set forth below. Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and on information and belief as to all other matters, including, *inter alia*, investigation conducted by and through their attorneys.

## NATURE OF THE ACTION

2.     At all times relevant herein Defendants jointly operated the for-profit school, DeVry University. DeVry provides hundreds of classes taught at locations throughout the country and online. Since at least 2008, Defendants have made numerous deceptive claims regarding their historical student employment and income statistics in order to get new students to enroll at DeVry, and pay more in tuition than they would at other schools advertising a history of less-successful graduate outcomes. Specifically, Defendants claim that 90% of their students actively seeking employment had careers in their fields of study within six months of graduation (the "90% Placement Claim"). Similarly, Defendants systematically represented that DeVry University graduates obtained jobs with significantly higher incomes than graduates of other colleges or universities (the "Higher Income Claim"). Using these claims allowed DeVry to inflate its tuition prices and induce students to pay more than they otherwise would have, if they would have enrolled at all.

3.     These claims are not meaningless statistics. Rather, as the Department of Education has recognized, for-profit institutions like DeVry use these misleading claims as critical selling

points to get prospective students to enroll.[1] Using high-pressure sales tactics to leverage these statistics, DeVry is able to charge significantly more for its services than other universities advertising lower—but true—graduate outcome statistics,[2] even though DeVry's students—even those who graduate—are no more likely to land a job than those who didn't go to college.[3]

4.      This enrollment model is crucial to DeVry's success. Because DeVry derives the vast majority of its income from federal financial aid programs, it is incentivized to get as many students to enroll, take out loans, and make as many tuition payments as possible. If—and more likely, when—those students do not graduate or find jobs, the former students are stuck with crippling debt, while DeVry simply gets other unwitting prospects to buy into its 90% Placement Claim and Higher Income Claim, and to enroll in those former students' places. Simply put, DeVry's business model is built on boosting its initial enrollment numbers, not its students' long-term success. The 90% Placement Claim and Higher Income Claim reflect this myopic focus.

5.      In early 2016, however, it was publicly revealed that Defendants' 90% Placement Claim and Higher Income Claim were false. Unfortunately, tens of thousands of students and consumers reasonably relied on these claims. They subsequently enrolled in DeVry, borrowing millions of dollars' worth of student loans to purchase educational services and products from Defendants, when—had they known the truth behind Defendants' claims—they would have paid

---

[1]      Department of Education, Program Integrity: Gainful Employment, 79 Fed. Reg. 64890-01, 64890 (Oct. 31, 2014) ("[P]rograms are engaging in aggressive and deceptive marketing and recruiting practices. As a result of these practices, prospective students and their families are potentially being pressured and misled into critical decisions regarding their educational investments that are against their interests."); *see also* U.S. Gov't Accountability Office, GAO-10-948T, Undercover Testing Finds Colleges Encouraged Fraud and Engaged in Deceptive and Questionable Marketing Practices (2010).

[2]      79 Fed. Reg. at 64907. In fact, DeVry discounted its tuition by as much as 20% for some degree programs after it stopped making the 90% Placement Claim.

[3]      Rajeev Darolia, *Do Employers Prefer Workers Who Attend For-Profit Colleges? Evidence from a Field Experiment*, National Center for Analysis of Longitudinal Data in Education Research (Aug. 2014), https://caldercenter.org/sites/default/files/WP-%20116.pdf; Julian T. Miller, *Program Integrity and the Implications of the Corporate Identity in Higher Education*, 7 Brook. J. Corp. Fin. & Com. L. 509, 526 (2013) (noting Department of Education's concern that "higher tuition costs at for-profit universities provide[] no return through gainful employment").

substantially less for their enrollment or wouldn't have enrolled at all.

6.     Plaintiffs, and the students and consumers they seek to represent, are victims of DeVry's predatory practices. They have read and heard DeVry's 90% Placement Claim and Higher Income Claim, and relying on truth and accuracy of these claims, enrolled and paid DeVry's inflated tuition. Had they known the truth of these statements—that the 90% Placement and Higher Income Claims were unsubstantiated—they would not have enrolled at DeVry or would have paid less to do so.

7.     Accordingly, Plaintiffs, on their own behalves and on behalf of a class of similarly situated individuals, bring this lawsuit and seek damages, and restitution, together with costs and reasonable attorneys' fees, the calculation of which will be based on information in the possession of Defendants.

## JURISDICTION AND VENUE

8.     This Court has original jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because: (a) at least one member of the putative Class is a citizen of a state different from DeVry; (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs; (c) the proposed Class consists of more than 100 Class Members; and (d) none of the exceptions under the subsection apply to this action.

9.     This Court has supplemental jurisdiction over the California Unfair Business Practices Act, Cal. Bus. & Prof. Code §§ 17200, *et seq*. ("UCL"), and other state statutory and common law claims pursuant to 28 U.S.C. § 1367 (providing for supplemental jurisdiction over pendant state law claims).

10.     This Court has personal jurisdiction over Defendants because: (a) they are registered to, and in fact do, conduct business in California; and (b) they have sufficient minimum contacts in California, or otherwise intentionally avail themselves of the markets within California through the promotion, sale, marketing, and distribution of its products and services, to render the exercise of jurisdiction by this Court proper and necessary.

11.     Venue is proper in this District under 28 U.S.C. § 1391 because: (a) Plaintiff Swindell is a resident of, and domiciled in, this District, (b) Defendants conduct substantial

- 3 -

business in this District, and (c) a substantial part of the events giving rise to Plaintiffs' claims alleged herein occurred in this District.

## PARTIES

12.     Plaintiff Dennis Magana is a natural person and citizen of California.

13.     Plaintiff Scott Swindell is a natural person and citizen of California.

14.     Plaintiff David Torosyan is a natural person and citizen of California.

15.     Defendant Adtalem is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 500 West Monroe Street, Chicago, Illinois. Adtalem transacts business throughout this District, the State of California, and across the United States. At all times material to this action, acting alone or in concert with others, Adtalem (including when it was known as DeVry Education Group, Inc.) has advertised, marketed, distributed, and sold products and services to consumers and students in California and nationwide, and with respect to the acts and practices of DVU that are described herein: (a) dominated and controlled DVU's acts and practices; and (b) knew, approved of, and benefitted from DVU's acts and practices. Adtalem specifically acknowledged that its primary income comes from the cash received from payments made to its institutions, like DVU, for student tuition, books, other educational materials and fees, including through loans. What's more, Adtalem controls and manages DVU's funding, including the resources that are allocated to it, and its participation in federal loan programs.

16.     Defendant DVU is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 3005 Highland Parkway, Downers Grove, Illinois. At all times relevant herein, DVU was a wholly-owned subsidiary of Adtalem. DVU transacts business throughout this District, the State of California, and across the United States. At all times material to this action, acting alone or in concert with others, DVU advertised, marketed, distributed, or sold the products and services to consumers and students in the California and throughout the United States.

17.     At all times mentioned in the causes of action alleged herein, each Defendant was acting in concert with, and/or was an agent and/or employee of each and every other Defendant.

- 4 -

In performing the acts and/or omissions stated herein, each Defendant was acting within the course and scope of a common enterprise, and with the consent and authorization of each of the remaining Defendants. All actions of each Defendant as alleged in the causes of action stated herein were ratified and approved by every other Defendant and/or its officers or managing agents. In fact, in response to Department of Education requests to DeVry University, Inc. for information and substantiating documentation regarding the 90% Placement Claim, it was Adtalem—through its predecessor, DeVry Education Group—that responded on DeVry University, Inc.'s behalf. Adtalem similarly entered into joint settlements with regulators wherein it agreed to stop making the 90% Placement Claim. Further evidencing Adtalem's control over DeVry with respect to its marketing practices in particular, Adtalem hired a Chief Marketing Officer responsible for streamlining marketing efficiencies across all Adtalem institutions—including DeVry University, Inc.

## COMMON FACTUAL ALLEGATIONS

18.    Adtalem is a for-profit education company with a market capitalization of nearly $3 billion and total annual revenues approaching $2 billion, or $168,000 per employee. The marketing and sale of for-profit educational goods and services is big business, and Adtalem is one of the biggest.

19.    At all times relevant herein, Adtalem owned and operated DVU. Together, as DeVry, they collectively comprise approximately 60 campuses in the United States, including in California, and an online division that offers 10 certificate, diploma, and degree programs with over 30 concentrations in health care, business, and technology.

20.    As a for-profit institution, enrollment growth is critical to DeVry's success for several reasons. First, DeVry's high attrition rate means that it needs to replace its income from tuition paid by students who enroll but subsequently leave its program. For example, DeVry's 2014 graduation rate for the 2008 first-time, full-time entering class to which the graduation rate applies was only 32%. Increasing enrollment ensures that DeVry covers its tuition losses from those that students that don't graduate.

21.     Second, nearly every student that enrolls provides a new revenue stream to DeVry in the form of federal loans. Historically, DeVry has derived nearly 80% of its revenues from Title IV federal education funds, such as the Pell grant, Stafford loan, and Veterans Affairs education programs, which assist students in paying for higher education. According to the U.S. Department of Education, DeVry received more than $1 billion in taxpayer dollars through federal student aid in 2015 alone.[4]

22.     Finally, increasing enrollment rates—and thereby its bottom line—also ensures that DeVry meets the revenue and profit projections that its investors expect. As a publicly-traded, for-profit education company it must consistently show enrollment growth, which is a closely watched metric by Wall Street analysts.

23.     To ensure DeVry meets its enrollment goals, DeVry spends hundreds of millions of dollars each year (*e.g.*, $264 million in 2015) advertising, marketing, recruiting, and promoting DeVry's job placement and post-graduate income claims. To that end, DeVry employs a large sales and recruiting staff to promote its "graduate outcome" claims through a variety of mediums. In 2010, for example, DeVry's recruiting staff outnumbered its career counselors by a factor of ten.

24.     These recruiters are trained to use an approach called "the value proposition of the program," which emphasizes the possible outcomes of the program—like getting a job and earning a higher income—against the cost to the student. For example, by emphasizing that a DeVry education is likely to get the student a job in his or her chosen field or a higher income when he or she starts, the high price of an education at DeVry is downplayed and pitched as a more reasonable investment. Critically, prospective students can only make informed choices about whether the

---

[4]     To underscore that DeVry's focus is on the up-front enrollment of students, and not their long-term success, consider that DeVry students cumulatively hold $8.3 billion in student debt—the fourth highest debt volume of any higher education institution in America—and have a 2009 five-year cohort default rate of 43%. This means that approximately $3.6 billion in revenues that DeVry received from students in the form of federal student loans is now either in forbearance or in default. *See* Department of Education, Program Integrity: Gainful Employment, 76 Fed. Reg. 34386-01, 34387 (June 13, 2011) ("The revenues of these institutions are dependent on the number of students they enroll in their programs; they are not otherwise dependent on whether their students graduate, find jobs, and ultimately repay their loans.").

advertised benefits of the program outweigh its costs if the advertised representations—the supposed "value" the education provides—are true.

25.     The historical outcomes that Defendants advertised to students in this case were based on the 90% Placement Claim and Higher Income Claims.

26.     The form Enrollment Agreements that each DeVry student signed when enrolling in any DeVry program promised that the post-graduation information DeVry provided students— information on which prospective students based the "value" of a DeVry education—were complete and accurate. Thus, by its own promises and material representations, DeVry's statements regarding employment and income rates are supposedly accurate, complete, and meant to be relied upon.

27.     Specifically, DeVry made the following promises in its form Enrollment Agreement:

**Accurate Information Disclosure**

DeVry publishes accurate information about its programs, policies, services, and graduate outcomes. Complete, accurate information is provided on our websites, In [sic] our catalogs, and in advertisements and other materials published by DeVry.

**Career Services**

DeVry's graduate employment statistics do not include graduates who do not actively participate in an employment search.

(*See* Form Enrollment Agreement, attached as Exhibit A.)

**Defendants' 90% Placement and Higher Income Claims Are False and Misleading.**

28.     To recruit new students, DeVry made false, deceptive, and unfair claims about the job placement rates of its graduates, including without limitation, that 90% of DeVry graduates who were actively seeking employment had obtained jobs in their field of study within six months of graduation and that one year after graduation DeVry graduates' jobs almost always paid significantly higher than entry level positions, and that its bachelor's degree students on average earned 15% more one year after graduation than graduates from other colleges and universities.

29.    This suit is not the first time DeVry has faced scrutiny for its 90% Placement Claim and Higher Income Claim. Indeed, regulatory bodies across the country have taken action against Defendants, arguing that these misleading claims induced tens of thousands of students into enrolling in DeVry, collectively netting Defendants millions, much of it thorough loan disbursements.[5]

### ***Defendants' 90% Placement Claim***

30.    DeVry heavily advertised and promoted its false and misleading 90% Placement Claim despite the fact that it knew the true placement rate and graduate employment statistic for graduates that had completed its programs and obtained employment was much lower.

31.    The true statistics for DeVry's graduate outcomes are abysmal, rendering DeVry's promotional and advertising statements false, misleading, and inaccurate. DeVry's true gainful employment rate and graduate employment statistic for the years 2008–2014 has been pegged to be between 20% (or less) and 50%.[6]

---

[5]    On January 27, 2016, the Federal Trade Commission ("FTC") filed a civil complaint (the "FTC Lawsuit") against DeVry in the United States District Court for the Central District of California alleging that certain aspects of DeVry's 90% Placement and Higher Income Claims were false, deceptive, unfair, misleading, unsubstantiated, and illegal at the time they were made in violation of Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a), as amended (the "FTC Act"). On January 27, 2016, DeVry received a Notice of Intent to Limit from the Department of Education ("DOE") Office of Federal Student Aid (the "January 2016 Notice"), based on a portion of its pending August 28, 2015 inquiry, informing DeVry of the DOE's intention to impose certain limitations on DeVry because of its statements regarding the post-graduation employment outcomes of DVU students. The DOE ultimately found that "[a]fter reviewing the information that DeVry provided, Federal Student Aid found that DeVry could not provide evidence to substantiate this [90% Placement] claim." Department of Education, *U.S. Department of Education Reaches Settlement with DeVry University Over Job Placement Claims*, Oct. 13, 2016,    https://www.ed.gov/news/press-releases/us-department-education-reaches-settlement-devry-university-over-job-placement-claims. On March 14, 2016, the Department of Veterans Affairs (the "VA") suspended DeVry from participation in a program that identifies schools doing a good job of serving former troops in light of the FTC Lawsuit accusing the for-profit chain of misleading consumers about the employment and earnings of its graduates in advertisements. Several other state Attorneys General have similarly launched investigations into DeVry's representations.

[6] Study after study has concluded that graduates of for-profit institutions like DeVry are no more likely to find a job than those with a degree from non-profit postsecondary schools or without any degree at all. *See, e.g.*, Stephanie Riegg Cellini and Nicholas Turner, *Gainfully Employed? Assessing the Employment and Earnings of For-Profit College Students Using Administrative Data*, J. Hum. Resources, Jan. 30, 2018 (forthcoming Spring 2018) (finding students graduating non-profit institutions fare better than those attending for-profit institutions on nearly every economic measure); David Deming, et al., *The For-Profit Postsecondary School Sector: Nimble*

---

- 8 -

32.     To make their promotional and advertising claims, Defendants use information they obtain from students and other third parties about students' majors, graduation dates, their employment, and DeVry's classifications of their employment status. Defendants used and manipulated these records to misleadingly calculate the false 90% Placement Claim.

33.     The data, records, and information used by Defendants to make the 90% Placement Claim provide a false basis for making Defendants' claims. Defendants improperly counted a substantial number of DeVry graduates as having been placed in a job successfully (*e.g.*, those who were employed when they enrolled and who never actively participated in an employment search). Similarly, Defendants excluded a substantial number of graduates in the pool of those actively seeking employment who should not have been excluded, and have been doing so for decades. For example, Defendants count graduates who did not obtain a job as a result of obtaining a degree from DeVry, and include DeVry graduates who after graduation continued with the same job they had when they enrolled at DeVry. As one internal letter to DeVry's president explained, "[r]emoval of these graduates from our numbers has given us the opportunity to present a much higher percentage of placed students." *See* <u>Figure 1</u>, below.

---

*Critters or Agile Predators?*, 26(1) J. Econ. Persp. 139–64 (Winter, 2012) (finding for-profit graduates faced higher levels of unemployment than non-profit schools). Similarly, a Boston University study found that graduates of for-profit institutions were less likely to be employed after leaving their programs than graduates of similar public university programs. Despite the results of these studies, Defendants have consistently pushed an alternative narrative, insisting that 90% of its graduates have jobs in their chosen fields within six months of graduation.



**Figure 1.**

34.     Defendants also unreasonably count jobs that employers, industry experts, graduates, and consumers would not reasonably consider to be in the graduate's field of study, and exclude students as "inactive" who were in fact seeking jobs (*i.e.*, reviewing jobs in the DeVry database, attending job interviews, attending DeVry career fairs, actively applying for positions, and actively following up with prospective employers). The actual percentage of DeVry graduates who, at or near the time they graduated, found jobs that could be reasonably considered "in their field" is in fact significantly and materially smaller than 90%.[7]

---

[7]     Many of the graduates themselves do not consider themselves as employed in their fields of study when reporting to DeVry. Nevertheless, Defendants misrepresent them as employed in their respective fields of study, including without limitation in the class of 2012: (1) graduates with degrees in technical management who were working as (a) a rural mail carrier (human

35.     One DeVry employee who worked in DeVry's career services office confirmed that DeVry employees there were given lists of upcoming graduates, and would continue to check in with them for the six months following graduation. If they received a job—any job, regardless of whether they had that job prior to attending DeVry, whether it was in their field of study, or whether it was full time—they would be counted in the 90% Placement Claim. If they did not have a job, they would not be considered for purposes of calculating the claim. The career services worker stated that there was no follow-up or incentive to work with graduates after six months had elapsed since their graduation.

36.     Following the resolution of multiple lawsuits initiated by regulatory bodies against DeVry, Defendants were ultimately enjoined from making the 90% Placement Claim as part of their advertising.[8] When it was no longer able to make the Claims, DeVry reduced its tuition prices for new students applying to certain bachelor's degree programs by as much as 20%, and began phasing out other programs.

### Defendants' Higher Income Claim

37.     DeVry has also made its false, deceptive, and unfair Higher Income Claim about the median income levels of its graduates. Defendants have made these claims repeatedly and in a

resources concentration); (b) a yard salesman at a nursery (business information systems concentration); (c) a sales associate at Macy's (general technical concentration); (d) a driver delivering rain gutters for a construction services company; (e) a data entry specialist for a radio station (human resources concentration); and (f) unpaid volunteers at medical centers (human resources management and health services management concentrations); (2) a graduate with a degree in business administration (health services management concentration) working as a server at the Cheesecake Factory; (3) a graduate with a degree in business administration (health care management concentration) working as a car salesman; (4) a graduate with a degree in business administration (accounting concentration) working as a secretary at a prison; and (5) graduates with various degrees working as customer service representatives. Thus, even in situations where DeVry relies on self-reported employment data—i.e., a person reports finding a job as a mail carrier—DeVry nonetheless may misclassify that data by considering it a job within a student's field of study—i.e., misclassifying the mail carrier job as within that student's technical management degree field—to bolster its 90% Placement Claim.

[8]     Neither Plaintiffs nor any of the putative Class Members did discover or could have discovered with any amount of reasonable diligence, the true facts regarding DeVry's misrepresentations until January 27, 2016, when the FTC Lawsuit was filed. Therefore, Plaintiffs' and the Class Members' claims are within any applicable statutes of limitations.

systematic manner since at least 2008. Defendants have made the material representation that seeking an education at DeVry statistically results in higher incomes than comparative programs.

38.     Defendants falsely represented that its graduates could earn more than four-year college students starting their careers. Specifically, Defendants publicly represented that, one year after graduation, DeVry students who earned bachelor's degrees on average earn 15% more than graduates from other colleges and universities. The true fact is that DeVry students do not earn more one year after graduation than four-year college students do in the same one year after they graduate.

39.     In using and manipulating false graduate outcome information to make their Higher Income Claim, Defendants also falsely misrepresented and artificially inflated the average annual compensation of its graduates by: (a) improperly counting a substantial number of DeVry graduates as having been placed successfully (*e.g.*, those who were employed when they enrolled, who never actively participated in an employment search, and who generally earn more than graduates who accept employment after graduation); (b) improperly excluding a substantial number of graduates in the pool of those actively seeking employment, who should not have been excluded, and who had zero income from education-related positions; (c) improperly counting graduates who did not obtain a job as a result of obtaining a degree from DeVry; and (d) improperly including DeVry graduates who after graduation, continued with the same job they had when they enrolled in DeVry and who generally earn more than graduates who accept employment after graduation.

40.     In order to further bolster their deceptive Higher Income Claim, in 2012, Defendants hired a third-party company to obtain income data from students who had graduated from DeVry and other schools in 2010. DeVry then used and manipulated the data for marketing purposes. In using the Higher Income Claim in its advertisements and sales pitches, DeVry knew, or should have known, the reliability of the conclusions and information contained in the income report was contradicted by its own data. For instance, the third-party information did not account or adjust for material differences in age, experience, and field of study.

*Magana, et al. v. Adtalem Global Education, Inc., et al.*
CLASS ACTION COMPLAINT

41.    Further, DeVry's own income statistics that it routinely collected annually and directly from thousands of its own graduates materially differed from the third-party report, which consisted of a sample size of only several hundred individuals per year. As such, DeVry was on notice that the third-party data was not reliable or representative. And Defendants knew or should have known the conclusions and information contained in the income report were false because the methods and methodology of the survey that underlay the income report were questionable.

42.    Due to the flaws in the third-party survey, Defendants' reliance on the third- party data for its Higher Income Claims was unreasonable, and Defendants knew or should have known that their Higher Income Claims and representations were false and unreliable. Indeed, based upon internal and external data, DeVry knew that its graduates did not in fact earn 15% more than other bachelor's degree graduates from all other schools.:

***DeVry and Adtalem Executives Have Reiterated DeVry's False Statements***

43.    In the 2008–2009 DeVry Academic Catalog, DVU President David J. Pauldine— who was also an Executive Vice President at Adtalem (when it was known as DeVry Education Group)—represented:

> [S]ince 1975, DeVry has graduated more than 230,000 students at the undergraduate level. Of graduates in the active job market, 90 percent were employed in career-related positions within six months of graduation. It's no wonder we say with conviction that at DeVry, we major in careers.

44.    In the 2009–2010 DeVry Academic Catalog, Mr. Pauldine represented:

> For over 30 years, of DeVry graduates in the active job market or already employed, 90 percent have enjoyed careers in their field of study within six months of graduation.

45.    In addition to the misrepresentations made by DVU President Dave Pauldine, in DeVry's August 8, 2013 fourth quarter earnings call, Adtalem's Chief Executive Officer Daniel Hamburger stated without qualification:

> A recent Gallup poll found that the factor adult Americans say is most important in selecting a college is the percent of graduates who find a good job. And this is what DeVry University does. *The latest numbers are in, and DeVry University's employment statistics increased more than 90%. 90% of our graduates in the active job market are employed in their field of study within 6 months of graduation, and they're earning an average of over $43,500.* That's higher than the median family

- 13 -

household income of our students before they enrolled at DeVry University. [Emphasis added].

46.     Similarly, the core focus of DeVry's 90% Placement Claim and Higher Income Claims is demonstrated in a "Letter to Shareholders" addressed to "Fellow Owners, Students, Colleagues, and Friends" written on or about August 29, 2013, wherein Adtalem's Chief Executive Officer Hamburger stated:

> The best measure of our quality is the successful outcomes that our students achieve. Notably, 90 percent of DeVry University's 2012 graduates active in the job market were employed in their fields of study within six months of graduation, earning an average of more than $43,500 annually.

He went on to represent:

> PayScale recently validated the ROEI [return on educational investment] of DeVry University, ranking three campuses in the top 100 list of PayScale's annual College Return on Investment Report.

47.     DeVry's emphasis on its 90% Placement Claim and Higher Income Claim is also demonstrated in its 10-K filing with the SEC for its fiscal year ending June 30, 2013, where DeVry stated,

> DeVry University's highly integrated brand initiative *focuses on the university's graduate employment success,* while emphasizing DeVry University as an accredited, highly-respected academic institution. The brand campaign is grounded in ongoing in-depth consumer, marketplace and brand research, and leverages a number of channels, including broadcast, print and Internet advertising, public relations, and social media, as well as local marketing efforts. [Emphasis added].

48.     DeVry went on to represent:

> One measure of success is the employment outcomes of DeVry University graduates. Each year, thousands of DeVry University graduates have started careers in their chosen fields within 6 months or less of their graduation. Ninety percent of DeVry University's calendar 2012 graduates in the active job market were employed in their fields of study within six months of graduation at an average salary of $43,539. These statistics include graduates of associate and bachelor's degree programs and those who were already employed in their field of study.

## PLAINTIFF MAGANA'S EXPERIENCE

49.     Plaintiff Dennis Magana is a resident of Needles, California. Since at least 2008, Plaintiff Magana viewed DeVry's television ads and heard DeVry's radio ads stating that 90% of DeVry graduates had jobs in their fields of study within six months of graduation, and that

DeVry's bachelor's degree graduates earned on average 15% more one year after graduation than graduates of bachelor's degree programs at other college and universities. In or around the third quarter of 2009, Plaintiff Magana had several face-to-face meetings and telephone calls with DeVry sales people wherein they recited a sales pitch stating that 90% of DeVry graduates had jobs in their fields of study within six months of graduation, and that DeVry's bachelor's degree graduates earned on average 15% more one year after graduation than graduates of bachelor's degree programs at other college and universities.

50.     In or around January or February 2008, DeVry "recruiters" presented a slide show and handed out brochures to Mr. Magana at his high school. The brochures and slide show he was presented with recited that 90% of DeVry graduates had jobs in their fields of study within six months of graduation, and that DeVry's bachelor's degree graduates earned on average 15% more one year after graduation than graduates of bachelor's degree programs at other college and universities. At the time, Plaintiff Magana was considering other post-secondary education options including, without limitation, attending community college.

51.     Plaintiff Magana reviewed the brochures he was given and visited the DeVry website in September 2009, where he again saw the claim that 90% of DeVry graduates had jobs in their fields of study within six months of graduation, and that DeVry's bachelor's degree graduates earned on average 15% more one year after graduation than graduates of bachelor's degree programs at other college and universities. During his visit to the website, he completed an online request for information. Mr. Magana received an immediate telephone call from a "Ms. Newman" who was a DeVry "recruiter" and scheduled a meeting at the Palmdale DeVry campus for the same day.

52.     At that meeting with Ms. Newman, Plaintiff Magana was given a packet that contained brochures and other written promotional material, including documents stating that 90% of DeVry graduates had jobs in their fields of study within six months of graduation, and that DeVry's bachelor's degree graduates earned on average 15% more one year after graduation than graduates of bachelor's degree programs at other college and universities. Ms. Newman herself verbally repeated that 90% of DeVry graduates had jobs in their fields of study within six months

of graduation, and that DeVry's bachelor's degree graduates earned on average 15% more one year after graduation than graduates of bachelor's degree programs at other college and universities, and also stated Mr. Magana would have a job within six months following his graduation.

53.     Ms. Newman told Mr. Magana that large employers (*e.g.*, Cisco, IBM, GE, etc.) reported being very happy with DeVry's graduates and supported DeVry's student programs. Ms. Newman told Mr. Magana employers repeatedly and enthusiastically recruited and hired DeVry graduates before and above graduates from other schools.

54.     In reliance on the information set forth on DeVry's website, in their television ads, in the brochures, in the slide shows, and the representations provided by Ms. Newman, Plaintiff Magana enrolled online as a full-time student with DeVry pursuing a bachelor's degree on October 26, 2009.

55.     Defendants' tuition is considerably higher than other post-secondary institutions, including the alternative schools Plaintiff Magana was considering. But, based on the false and misleading 90% Placement Claim and Higher Income Claim set forth herein, Plaintiff Magana believed he would have the earning power to more than make up for the higher related expense and be in higher demand in the job market.

56.     Plaintiff Magana, in reliance on DeVry's false and deceptive 90% Placement Claim and Higher Income Claim, enrolled and paid DeVry over $55,000 in tuition comprised from student loans, plus interest, that were paid directly to and converted by DeVry for its own use, plus interest, and other DeVry education related expenses such as books and supplies, including instruction on DeVry's website.

57.     In sum, based on the 90% Placement Claim and Higher Income Claim, Mr. Magana was induced to enroll at DeVry, borrow student loans, and pay the proceeds over to DeVry as tuition and for the purchase of written materials such as textbooks. These were all offered at prices significantly higher than what he would have paid for at the other post-secondary educational options he was considering. However, based on DeVry advertising the 90% Placement and Higher Income Claims, Mr. Magana thought it was worth paying more in tuition than paying less in tuition

at schools that did not advertise such claims. Had he known the truth of the 90% Placement Claim and Higher Income Claim, he would have paid less to enroll or wouldn't have enrolled at all.

### PLAINTIFF SWINDELL'S EXPERIENCE

58.     Plaintiff Swindell is a resident of Sacramento, California. Since at least the middle of 2009, Mr. Swindell had seen DeVry's television ads and heard DeVry's radio ads stating that 90% of DeVry graduates had jobs in their fields of study within six months of graduation, and that DeVry's bachelor's degree graduates earned on average 15% more one year after graduation than graduates of bachelor's degree programs at other college and universities. In or around the end of September or beginning of October 2009, Plaintiff Swindell called DeVry's Elk Grove campus and had a telephone conversation with a sales person who recited a sales pitch stating that 90% of DeVry graduates had jobs in their fields of study within six months of graduation, and that DeVry's bachelor's degree graduates earned on average 15% more one year after graduation than graduates of bachelor's degree programs at other college and universities.

59.     Plaintiff Swindell went to DeVry's campus and was shown around and given a tour. Mr. Swindell then met face to face with an "admissions advisor" or salesperson who gave him another sales pitch and a computer presentation which recited that 90% of DeVry graduates had jobs in their fields of study within six months of graduation, and that DeVry's bachelor's degree graduates earned on average 15% more one year after graduation than graduates of bachelor's degree programs at other college and universities.

60.     Plaintiff Swindell was also given brochures and other promotional material stating that 90% of DeVry graduates had jobs in their fields of study within six months of graduation, and that DeVry's bachelor's degree graduates earned on average 15% more one year after graduation than graduates of bachelor's degree programs at other college and universities. In sum, the sales pitch, written materials, and computer presentation reiterated verbally, on screen, and in writing the 90% Placement Claim and Higher Income Claim.

61.     Mr. Swindell was specifically told "90 percent of DeVry graduates get a high-paying job within months of graduation." Additionally, he was told that he should expect to make "six figures" based on his previous job history and the education he was seeking.

62.     At the time, Plaintiff Swindell was considering two other schools: University of Phoenix and Heald College. Mr. Swindell was informed DeVry classes would be starting in the next few days and he had to hurry, otherwise he would have to wait eight (8) weeks to start his classes.

63.     Mr. Swindell was enthusiastic after the DeVry meeting and did hurry. He immediately went and met with representatives of the University of Phoenix. However, he decided to enroll at DeVry to pursue a bachelor's degree in project management based the 90% Placement Claim and Higher Income Claim presented to him in the admissions process. Mr. Swindell believed an education at DeVry—one advertised to have superior post-graduate outcomes—would give him greater earning power and put him in higher demand in the job market, and thus would be worth paying more in tuition than paying less in tuition at schools that did not advertise such claims.

64.     Plaintiff Swindell entered into an enrollment agreement online with DeVry and attended DeVry at its Elk Grove campus commencing in October 2009.

65.     Mr. Swindell followed all of DeVry's recommendations in connection with DeVry's educational program and job placement services, accumulating over $79,000 of debt in the process. He continued to attend classes and use the DeVry website until his graduation in December 2012 with a 3.96 grade point average. Unfortunately, Mr. Swindell came to learn that the representations he relied on to enroll at DeVry were, in his words, "Lies, lies, lies."

66.     In sum, based on the 90% Placement Claim and Higher Income Claim, Mr. Swindell was induced to enroll at DeVry and pay DeVry for tuition and for the purchase of written materials such as textbooks. These were all offered at prices significantly higher than what he would have paid for the other post-secondary educational options he was considering. However, based on DeVry advertising the 90% Placement and Higher Income Claims, Mr. Swindell thought it was worth paying more in tuition than paying less in tuition at schools that did not advertise such claims. Had he known the truth of the 90% Placement Claim and Higher Income Claim, he would have paid less to enroll or wouldn't have enrolled at all.

## PLAINTIFF TOROSYAN'S EXPERIENCE

67.     Plaintiff David Torosyan is a resident of North Hollywood, California.

68.     In or around April of 2015, Mr. Torosyan went to DeVry's Sherman Oaks campus. Mr. Torosyan then met with DeVry Admissions Advisor Wajiha Usmam, who gave him a sales pitch and a presented a slide show, which stated that 90% of DeVry graduates had jobs in their fields of study within six months of graduation, and that DeVry's bachelor's degree graduates earned on average 15% more one year after graduation than graduates of bachelor's degree programs at other colleges and universities.

69.     Plaintiff Torosyan was also given and reviewed brochures and other promotional material stating that 90% of DeVry graduates had jobs in their fields of study within six months of graduation, and that DeVry's bachelor's degree graduates earned on average 15% more one year after graduation than graduates of bachelor's degree programs at other colleges and universities. In sum, the sales pitch, written materials, and computer presentation reiterated verbally, on screen, and in writing the 90% Placement Claim and Higher Income Claim.

70.     Mr. Torosyan was told that he should expect to make a higher income with a DeVry degree than he could with a degree from somewhere else—indeed, he was told to expect a starting yearly salary of at *least* $50,000 after receiving his degree from DeVry.

71.     At the time, Mr. Torosyan was attending California State University, Northridge. However, he decided to enroll at DeVry to pursue a bachelor's degree in Technical Management and Human Resources Management in reliance on the 90% Placement Claim and Higher Income Claim presented to him during the admissions process, as well as the fact that he could complete his degree quickly and online at DeVry.

72.     In reliance on the information set forth in DeVry's brochures and promotional materials, in the recruitment slide show, and the representations provided by Ms. Usmam, Plaintiff Torosyan entered into an enrollment agreement with DeVry on April 4, 2015 and attended DeVry online beginning in July 2015. (*See* Exhibit A.) Plaintiff Torosyan also frequently visited DeVry's Sherman Oaks campus.

73.     Plaintiff Torosyan, in reliance on DeVry's false and deceptive 90% Placement Claim and Higher Income Claim, paid over $30,000 in tuition to DeVry and had to take out student loans, including federal loans, in the process.

74.     Mr. Torosyan graduated from DeVry in April 2017 with a bachelor's degree in Business Administration with a focus in Human Resources.

75.     In sum, based on the 90% Placement Claim and Higher Income Claim, Mr. Torosyan was induced to enroll at DeVry, borrow student loans, and pay the proceeds over to DeVry as tuition. Based on DeVry advertising the 90% Placement and Higher Income Claims, Mr. Torosyan thought it was worth paying more in tuition at DeVry than paying less in tuition at schools that did not advertise such claims. Had he known the truth of the 90% Placement Claim and Higher Income Claim, he would have paid less to enroll or wouldn't have enrolled at all.

## CLASS ACTION ALLEGATIONS

76.     Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3) on behalf of themselves and all Members of the "Class," defined as:

> **Class**: All Students who purchased or otherwise paid for and received any part of a DeVry education program while residing in, or attending a DeVry campus located in, the State of California.

77.     Additionally, Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3) on behalf of themselves and all Members of the "DOE Borrower Subclass," defined as:

> **DOE Borrower Subclass**: All members of the Class who purchased or otherwise paid for and received a DeVry education program while residing in, or attending a DeVry campus located in, the State of California with direct student loan proceeds from the United States Treasury, and administered by the federal Department of Education.

78.     Finally, Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3) on behalf of themselves and all Members of the "Contract Subclass," defined as:

**Contract Subclass**: All members of the DeVry students residing in, or attending a DeVry campus located in, the State of California who: (a) entered into an enrollment agreement substantially in accordance with the terms and conditions of the Enrollment Agreement; and (b) purchased or otherwise paid for a DeVry University, Inc. education program.

79.     The Classes described in this Complaint may be jointly referred to as the "Class" or "Classes" and proposed Members of the Classes may be jointly referred to as "Class Members."

80.     The following people are excluded from the Class: (1) any judge or magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

81.     Plaintiffs and the Class Members satisfy the numerosity, commonality, typicality, adequacy, and predominance prerequisites for suing as representative parties pursuant to Rule 23 of the Federal Rules of Civil Procedure.

82.     **Numerosity**: The exact size of the Class is unknown and are not available to Plaintiffs at this time, but individual joinder in this case is impracticable. The Class likely consists of tens, if not hundreds, of thousands of individuals. Class Members can be easily identified through Defendants' records and objective criteria permitting self-identification in response to notice, and notice can be provided through techniques similar to those customarily used in other consumer fraud, unlawful trade practices, and class action controversies.

83.     **Typicality**: Plaintiffs' claims are typical of the claims of other Class Members, in that Plaintiffs and the Class Members sustained damages that all arise out of Defendants' enrollment agreements, wrongful conduct and misrepresentations, false advertising, and unlawful practices, and Plaintiffs and the Class Members sustained similar injuries and damages as a result of Defendants' uniform illegal conduct.

- 21 -

84.    **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Class and have retained counsel competent and experienced in complex class actions to vigorously prosecute this action on behalf of the Class. Plaintiffs have no interests that conflict with or are antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiffs.

85.    **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiffs and the Class, and those questions predominate over any questions that may affect individual Class Members. Common questions for the Class include, but are not necessarily limited to the following:

    a.    Whether Defendants' advertised 90% Placement and Higher Income Claims were unsubstantiated, and whether Defendants failed to disclose that their past post-graduate outcomes were not as expressly represented, warranted, promised, and covenanted;

    b.    Whether Defendants had a duty to disclose the truth about its 90% Placement Claim and Higher Income Claim in connection with the DeVry education program and services;

    c.    Whether Defendants knew or should have known their practices and representations related to the marketing, labeling, and sales of the education program were false, misleading, or confusing;

    d.    Whether Defendants' misrepresentations and omissions about its 90% Placement Claim and Higher Income Claim were likely to deceive, confuse, or create a misunderstanding;

    e.    Whether Defendants represented their products and services to include characteristics, uses, or benefits which they do not have;

    f.    Whether Defendants represented their products and services were of a particular standard, quality, or grade that were actually of another;

    g.    Whether Defendants advertised their products and services with intent not to sell them as advertised;

    h.    Whether Defendants represented that its products and services were the subject of a transaction which had been supplied in accordance with previous representations when they had not;

i. Whether Defendants' conduct, practices, and representations related to the marketing, advertising, labeling, and sales of the DeVry education program and services were unfair, deceptive, confusing, misleading, and/or unlawful in any respect, thereby violating the FAL, UCL, and other applicable state laws;

j. Whether Defendants collected, took, or received monies from student loan proceeds in Defendants' possession and belonging to Plaintiffs and the Class and wrongfully converted such monies to their own use and benefit;

k. Whether Defendants Breached the terms of their form Enrollment Agreement;

l. Whether Plaintiffs and the Class were damaged as a proximate cause or result of Defendants' breaches; and

m. Whether Plaintiffs and the Class are entitled to rescission, restitutionary, injunctive, declaratory, or other relief.

86.    **Superiority**: This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all parties is impracticable. The damages suffered by the individual Class Members will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. Thus, it would be virtually impossible for the individual Class Members to obtain effective relief from Defendants' misconduct. Even if Class Members could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort and expense will be fostered and uniformity of decisions ensured.

### FIRST CAUSE OF ACTION
**Violation of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, *et seq*.**
**(On Behalf of Plaintiffs and the Class)**

87.    Plaintiffs and the Class Members incorporate the foregoing allegations as if fully set forth herein.

- 23 -

88.     California's Unfair Competition Law prohibits unfair competition, defined as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [California's False Advertising Law]." Cal. Bus. & Prof. Code § 17200.

89.     Defendants willfully violated, and continue to violate, the "unlawful" prong of the UCL by violating applicable federal and state law, including Section 13(b) of the Federal Trade Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a), as well as California's Consumer Legal Remedies Act, False Advertising Law, and other applicable statutes and laws alleged herein.

90.     Defendants willfully violated, and continue to violate, the "fraudulent" prong of the UCL through misrepresentations, omissions, and non-disclosures and the 90% Placement Claim and Higher Income Claim, which are false, misleading, and have a tendency to deceive, and did deceive, Plaintiffs, Class Members, and the general public, as detailed herein.

91.     Defendants willfully violated, and continue to violate, the "unfair" prong of the UCL by profiting from their acts, omissions, misrepresentations and non-disclosures by using the 90% Placement Claim and Higher Income Claim to induce Plaintiffs and the Class Members to enroll at DeVry, borrow student loans, and pay them over to Defendants.

92.     The acts, omissions, misrepresentations, and non-disclosures related to Defendants' 90% Placement Claim and Higher Income Claim further constitute "unfair" business acts and practices under the UCL in that Defendants' conduct offends public policy against deceptive advertising and fraud and seeks to profit, capitalize on, and gain an unfair advantage over law-abiding competitors.

93.     Plaintiffs and the Class Members would not have purchased DeVry's products and related services, or would not have paid as much for them, had they known the true facts. As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent business practices, Plaintiffs and the Class Members have suffered injury-in-fact, including but not limited to, monetary loss in connection with purchases of the products and services they would not have purchased absent Defendants' unlawful conduct and false and/or misleading representations and

omissions, or would not have paid as much for, and have suffered economic damages, including incurring student loans and paying education-related costs, expenses, and charges they would not have otherwise incurred and paid.

94.     Neither Plaintiffs nor the Class Members did discover, or could have discovered with any amount of reasonable diligence, the true facts regarding DeVry's false misrepresentations until, at the earliest, when the FTC Lawsuit was filed. Therefore, Plaintiffs' and the Class Members' claims are within any applicable statutes of limitations, including the four-year statute of limitations for California's unfair competition law.

95.     Accordingly, Plaintiffs and the Class Members are entitled to, and hereby seek, an order of this Court enjoining Defendants from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices, and to take corrective action pursuant to Section 17203 of the UCL.

96.     Plaintiffs and the Class Members are further entitled to, and hereby seek an order for disgorgement and restitution of all monies acquired from the sales of education related costs, expenses, and charges which were unjustly acquired through acts of unlawful, unfair, and/or fraudulent competition by Defendants, as well as any other further equitable relief this Court may deem necessary, just, and proper under the circumstances. Additionally, Plaintiffs and the Class seek pre-and-post judgment interest and attorneys' fees and costs as allowed by statute. *See e.g.*, Cal. Civ. Proc. Code § 1021.5.

<u>**SECOND CAUSE OF ACTION**</u>
**Violation of California's False Advertising Law**
**Cal. Bus. & Prof. Code §§ 17500, *et seq.***
**(On Behalf of Plaintiffs and the Class)**

97.     Plaintiffs and the Class Members incorporate the above allegations as if fully set forth herein.

98.     California's False Advertising Law ("FAL") makes it unlawful for a company to make untrue or misleading statements about the services it offers in any advertising for those services. A plaintiff may recover under the FAL when a defendant's advertising includes false or misleading statements that the plaintiff relied on, and suffered a monetary loss as a result.

99.     In this case, Defendants violated the FAL by intentionally and knowingly disseminating the 90% Placement Claim and Higher Income Claim to Plaintiffs and the Class, which are misleading, deceptive, and/or untrue. Defendants knowingly and intentionally withheld material information from Plaintiffs and the Class members about the true statistics behind their 90% Placement Claim and Higher Income Claim for their own financial gain.

100.     Defendants' representations are false and misleading because, without limitation: (a) the actual percentage of DeVry graduates who, at or near the time they graduated, found jobs that could be reasonably considered "in their field" is in fact significantly and materially smaller than 90%; and (b) Defendants' own statistics showed that graduates of DeVry did not have any higher income than graduates from other schools and that such a claim was false, misleading, deceptive, and incomplete.

101.     Defendants intended that prospective students would rely on these misrepresentations, and in fact created an entire marketing campaign centered around them. Unsurprisingly then, Plaintiffs and the Class Members justifiably relied on the 90% Placement Claim and Higher Income Claim to purchase Defendants' products and services, and would not have purchased an education program or any other of Defendants' services, or would not have paid as much for them, had they known the truth about the 90% Placement Claim and Higher Income Claim.

102.     Neither Plaintiffs nor the Class Members did, or could have discovered with any amount of reasonable diligence, the true facts regarding Defendants' 90% Placement Claim and Higher Income Claim until, at the earliest, when the FTC Lawsuit was filed against DeVry. Therefore, Plaintiffs' and the Class Members' claims are within any applicable statutes of limitations, including the three-year statute of limitations for fraud and California's false advertising laws.

103.     As a direct and proximate result of Defendants' misrepresentations, Plaintiffs and the Class Members have suffered damages and injury-in-fact the form of, without limitation, liability for student loans, tuition, and other payments for their education program. Plaintiffs and the Class Members are entitled to, and hereby seek, an order for disgorgement and restitution of

all monies acquired from the sales of Defendants' education programs, which were unjustly acquired by its wrongful business practices,  along with reasonable attorneys' fees and costs, pre- and post-judgment interest, and any and all further equitable relief that this Court deems appropriate, including an injunction pursuant to Section 17535 of the FAL.

**THIRD CAUSE OF ACTION**
**Fraud/Material Misrepresentation**
**(On Behalf of Plaintiffs and the Class)**

104.    Plaintiffs and the Class Members incorporate the above allegations as if fully set forth herein.

105.    California Civil Code Section 1709 provides that "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

106.    "Deceit," within the meaning of Section 1709, includes "[t]he suggestion, as a fact, of that which is not true, by one who does not believe it to be true." Cal. Civ. Code § 1710(1).

107.    Defendants intentionally and knowingly made the 90% Placement Claim and Higher Income Claim, which were false, untrue statements of material facts to Plaintiffs and the Class Members concerning the education program. Defendants intentionally and knowingly misrepresented and/or suggested the aforementioned untrue or misleading facts to Plaintiffs and the Class Members with the intent to induce them to enroll and purchase an education program from Defendants. Indeed, the 90% Placement Claim and Higher Income Claim were part of a pervasive nationwide and decades-long advertising campaign.

108.    Defendants' representations are false and misleading because, without limitation: (a) the actual percentage of DeVry graduates who, at or near the time they graduated, found jobs that could be reasonably considered "in their field" is in fact significantly and materially smaller than 90%; and (b) Defendants' own statistics showed that graduates of DeVry did not have any higher income than graduates from other schools and that such a claim was false, misleading, deceptive, and incomplete.

109.     Plaintiffs and the Class Members justifiably relied on the 90% Placement Claim and Higher Income Claim and would not have purchased an education program or any other of Defendants' services, or would not have paid as much for them, had they known the truth about the 90% Placement Claim and Higher Income Claim.

110.     Neither Plaintiffs nor the Class Members did, or could have discovered with any amount of reasonable diligence, the true facts regarding Defendants' 90% Placement Claim and Higher Income Claim until, at the earliest, when the FTC Lawsuit was filed against DeVry. Therefore, Plaintiffs' and the Class Members' claims are within any applicable statutes of limitations, including the three-year statute of limitations for fraud.

111.     As a direct and proximate result of Defendants' misrepresentations, Plaintiffs and the Class Members have suffered damages and injury-in-fact the form of, without limitation, liability for student loans, tuition, and other payments for their education program. Plaintiffs and the Class Members are entitled to, and hereby seek, actual damages, punitive damages, treble damages, reasonable attorneys' fees and costs, and any and all further equitable relief that this Court deems appropriate.

**FOURTH CAUSE OF ACTION**
**Fraudulent Concealment/Intentional Omission of Material Facts**
**(On Behalf of Plaintiffs and the Class)**

112.     Plaintiffs and the Class Members incorporate the above allegations as if fully set forth herein.

113.     California Civil Code Section 1709 provides that "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." "Deceit," within the meaning of Section 1709, includes "[t]he suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact." Cal. Civ. Code § 1710(3).

114.     DeVry intentionally and knowingly concealed material facts from Plaintiffs and the Class Members that were known only to DeVry prior to Plaintiffs and the Class Members' borrowing, enrolling, and purchasing and using the DeVry products and services.

- 28 -

115.    DeVry intentionally and knowingly concealed the aforementioned material facts from Plaintiffs and the Class Members with the intent to induce them to borrow, enroll, purchase, and use Defendants' products and services, and continue to borrow, enroll, purchase, and use such Defendants' products and services from DeVry.

116.    Neither Plaintiffs nor the Class Members did discover, or could have discovered with any amount of reasonable diligence, the true facts regarding DeVry's false misrepresentations until, at the earliest, when the FTC Lawsuit was filed against DeVry. Therefore, Plaintiffs' and the Class Members' claims are within any applicable statutes of limitations, including the three-year statute of limitations for fraudulent concealment.

117.    DeVry had, and has, a duty to disclose the concealed information because Plaintiffs and the Class Members did not know of the concealed facts prior to purchasing and using the DeVry products and services, nor could they reasonably be expected to learn or discover such concealed facts prior thereto. Further, DeVry does not disclose that its 90% Placement Claim and Higher Income Claim are false. In fact, it affirmatively represents they are correct.

118.    Plaintiffs and the Class justifiably relied on the facts as they knew them at the time, and as a direct and proximate result of Defendants' fraudulent concealment of material facts, Plaintiffs and the Class Members have suffered actual injury-in-fact and damages, including but not limited to, monetary loss in connection with purchases of the education program and related services they would not have purchased absent Defendants' concealment, fraudulent omissions, and non-disclosures, or would not have paid as much for.

119.    Plaintiffs and the Class Members would not have borrowed, enrolled, purchased, or used the DeVry products and services, or would not have paid as much for them, had they known of the concealed information.

120.    As a direct and proximate result of DeVry's fraudulent concealment of material facts, Plaintiffs and the Class Members have suffered injury, including but not limited to, borrowing money and paying it over to DeVry to enroll and purchase Defendants' products and services, and monetary loss in connection therewith, which they would not have done absent DeVry's fraudulent omissions and non-disclosures.

121.    Accordingly, Plaintiffs and the Class Members are entitled to, and hereby seek, rescission, actual damages, punitive damages, reasonable attorneys' fees and costs under Cal. Civ. Proc. Code § 1021.5, pre-and post-judgment interest at the applicable legal rate, and any and all further equitable relief that this Court deems appropriate.

**FIFTH CAUSE OF ACTION**
**Negligent Misrepresentation**
**(On Behalf of Plaintiffs and the Class)**

122.    Plaintiffs and the Class Members incorporate the above allegations as if fully set forth herein.

123.    The elements of negligent misrepresentation are (1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage.

124.    Defendants expressly made the 90% Placement Claim, which misrepresented the truth that less than 90% of its graduates actively seeking employment found jobs in their field within six months of graduating. Defendants also made the Higher Income Claim, which misrepresented the truth that DeVry graduates' median incomes were not 15% higher than the median incomes of graduates of all other programs. To a student considering post-secondary schools, including Plaintiffs and the Class, such facts are material; an institution that points to a history of its graduates finding jobs and achieving higher earning is a more attractive choice than one that does not historically have such outcomes.

125.    Despite making the 90% Placement Claim and Higher Income Claim, Defendants did not have reasonable grounds for believing it to be true. Defendants failed to implement and maintain adequate measures to ensure the accuracy of these claims in connection with their education program. For example, in regards to the 90% Placement Claim, DeVry included some graduates with jobs that should have been excluded from calculating the claim and included others without jobs that should have been included in calculating the claim. Even though the underlying data was unreliable, Defendants went on to make the 90% Percent Claim without reasonable

grounds for substantiating the truth of the Claim or believing it to be true. With respect to the Higher Income Claim, even though the statistics related to the claims that DeVry itself collected materially differed from the data collected by third parties on DeVry's behalf, DeVry nonetheless chose to publish its claims instead of investigating or correcting any of the discrepancies that made the data unreliable. Here again, Defendants willingly misrepresented as fact a statistic that they did not have reasonable grounds to be believe was true.

126.    Defendants made the 90% Placement Claim and the Higher Income Claim at almost every step of the recruitment process with the intent that prospective students rely on these claims to enroll in Defendants' educational programs and confer substantial benefits on Defendants in the form of tuition and related payments. As discussed herein, these statistics were pointed to in the admissions process as a critical part of why students should pay more to attend DeVry over other, cheaper schools. Based on the history of past success, as apparently evidenced by the 90% Placement Claim and Higher Income Claim, prospective students were urged to enroll.

127.    Plaintiffs justifiably relied on the 90% Placement Claim and Higher Income Claim to enroll in Defendants' educational programs. After being subjected time and again to these claims, which were the principal driver of Defendants' recruitment strategy, Plaintiffs and the Class Members relied on them when deciding to enroll in the Defendants' educational programs. But for the 90% Placement Claim and Higher Income Claim, Plaintiffs and the Class Members would not have enrolled in Defendants' programs, or would have paid less to do so.

128.    Neither Plaintiffs nor the Class Members did discover, or could have discovered with any amount of reasonable diligence, the true facts regarding DeVry's misrepresentations until, at the earliest, when the FTC Lawsuit was filed against DeVry. Therefore, Plaintiffs' and the Class Members' claims are within any applicable statutes of limitations, including the three-year statute of limitations for negligent misrepresentation.

129.    As a direct and proximate result of their reliance on the misrepresentations in Defendants' 90% Placement Claim and Higher Income Claim, Plaintiffs and the Class suffered actual injuries-in-fact and economic damages, incurring student loan debt and paying education related costs that they would not have otherwise incurred and paid. Had Plaintiffs and the Class

known the truth behind these claims—that the 90% Placement Claim and Higher Income Claim were misrepresentations of DeVry graduates' true employment and income statistics—they would not have enrolled in Defendants programs or would have paid less to do so, if anything. In addition, Plaintiffs and the Class were opened up to independent personal liability related to the loans obtained and paid to DeVry in reliance on these claims.

130.    Plaintiffs and the Class seek compensatory damages with pre-and-post judgment interest, the costs of suit, attorneys' fees, and other and further relief as this Court deems just and proper.

## SIXTH CAUSE OF ACTION
### Breach of Contract
### (On Behalf of Plaintiff Torosyan and the Contract Subclass)

131.    Plaintiff Torosyan incorporates the foregoing allegations as if fully set forth herein.

132.    Plaintiff Torosyan and each Contract Subclass Member entered into a written, uniform Enrollment Agreement and contract with DeVry. Pursuant to the terms of the Enrollment Agreement, DeVry agreed, amongst other obligations, to provide the education program to Plaintiff Torosyan and Contract Subclass Members, who in turn agreed to pay DeVry money in the form of tuition payments.

133.    In the Enrollment Agreement, DeVry contractually represented, warranted, promised, covenanted, made as a condition precedent in, of, and to the Enrollment Agreement with Plaintiff Torosyan and the Contract Subclass that:

**Accurate Information Disclosure**

DeVry publishes accurate information about its programs, policies, services, and graduate outcomes. Complete, accurate information is provided on our website, In [sic] our catalogs, and in advertisements and other materials published by DeVry.

134.    Defendants incorporated the 90% Placement and Higher Income Claims into the Enrollment Agreement with Plaintiff Torosyan and the Contract Subclass by reference, by expressly referencing such information and stating that "[f]or comprehensive consumer information, please visit devryedu/studentconsumerinfo."

- 32 -

135.   Defendants contractually represented, warranted, promised, covenanted, and made a condition precedent in, of, and to the Enrollment Agreement with Plaintiff Torosyan and the Contract Subclass that:

**Career Services**

DeVry's graduate employment statistics do not include graduates who do not actively participation an employment search.

136.   Defendants breached their Enrollment Agreement with Plaintiff Torosyan and the Contract Subclass Members, in that DeVry's representations regarding the 90% Placement and Higher Income Claims in connection with the information about their programs, policies, services, and graduate outcomes provided on their website, in their catalogs, and in their advertisements and other materials published by Defendants were false, incomplete, inaccurate, deceptive, and unfair. Had Plaintiff Torosyan and the Contract Subclass Members known the falsity of the 90% Placement and Higher Income Claims made by Defendants in the Enrollment Agreement, they would not have entered in to the Enrollment Agreement, would not have paid as much for the education program, if they would have purchased any products and services from Defendants at all, and would not have taken out student loans and paid monies to Defendants.

137.   Defendants breached the Enrollment Agreement as alleged herein, and Plaintiff Torosyan and the Contract Subclass Members have been damaged as a direct and proximate result thereof. Plaintiff Torosyan and the Contract Subclass are entitled to actual damages in an amount to be determined in this proceeding.

**SEVENTH CAUSE OF ACTION**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiffs and the DOE Borrower Subclass)**

138.   Plaintiffs and the DOE Borrower Subclass Members incorporate the above allegations as if fully set forth herein.

139.   DeVry's 2014 10-K admits:

"Specialized staff at DeVry's home office review, interpret, and establish procedures for compliance with regulations governing financial assistance programs and

processing financial aid applications. Financial assistance programs are required to be administered in accordance with the standard of care and diligence of a fiduciary."

140.    As a participant in Title IV programs, Defendants are subject to the highest standard of care and diligence in administering such programs.

141.    Defendants owed Plaintiffs and the DOE Borrower Subclass Members a fiduciary duty to make sure that government financial assistance programs, including without limitation, student loans, and the processing of financial aid applications were administered in accordance with the standard of care and diligence of a fiduciary.

142.    Defendants breached their fiduciary duties to Plaintiffs and the DOE Borrower Subclass Members by, without limitation, failing to review, interpret, establish procedures for, and comply with regulations and the standard of care and diligence of a fiduciary in arranging, administering, and handling Plaintiffs' and the Class Members' student loans and financial assistance.

143.    Plaintiffs and the DOE Borrower Subclass Members justifiably relied on Defendants to meet the standard of care and diligence of a fiduciary, and as a direct and proximate result of Defendants' acts and omissions, Plaintiffs and DOE Borrower Subclass Members have suffered actual injury-in-fact and damages, including but not limited to, monetary loss in connection with borrowing student loans and purchases of an education program and related products and services they would not have borrowed for or purchased absent Defendants' concealment, fraudulent omissions, and non-disclosures, or would not have paid as much for. They have suffered economic damages, including incurring student loans and paying education related costs, expenses, and charges they would not have otherwise incurred and paid.

144.    Accordingly, Plaintiffs and the DOE Borrower Subclass Members are entitled to, and hereby seek, actual damages, punitive damages, treble damages, reasonable attorneys' fees and costs, and any and all further equitable relief that this Court deems appropriate.

145.    Neither Plaintiffs nor the DOE Borrower Subclass Members did discover, or could have discovered with any amount of reasonable diligence, the true facts regarding DeVry's false misrepresentations and breach of fiduciary duty until, at the earliest, when the FTC Lawsuit was

filed against DeVry. Therefore, Plaintiffs' and the Class Members' claims are within any applicable statutes of limitations, including the four-year statute of limitations for breach of fiduciary duty.

**EIGHTH CAUSE OF ACTION**
**Conversion**
**(On Behalf of Plaintiffs and the DOE Borrower Subclass)**

146.    Plaintiffs and the DOE Borrower Subclass Members incorporate the above allegations as if fully set forth herein.

147.    Plaintiffs and the DOE Borrower Subclass Members are the lawful owners of the student loan proceeds and other monies lent to and borrowed by them in the form of student loans from the U.S. Treasury and administered by the federal government's Department of Education.

148.    The student loan proceeds were paid directly to DeVry for Plaintiffs' and each DOE Borrower Subclass Member's account and benefit. As a result of Defendants' wrongful conduct, which includes their collection and receipt of student loan proceeds paid for Plaintiffs' and the DOE Borrower Subclass' benefit, Defendants have interfered with and converted Plaintiffs' and the DOE Borrower Subclass' ownership interest in, or right to possess, such student loan proceeds.

149.    Plaintiffs and DOE Borrower Subclass Members were the lawful owners of the loan proceeds, funds, and other monies deposited in accounts held by Defendants. The funds and monies held in these accounts were paid directly to DeVry and held for Plaintiffs and the DOE Borrower Subclass Members' account and benefit. As a result of DeVry's wrongful conduct, which includes its collection, taking, and receipt of loan proceeds, monies, and funds paid for Plaintiffs and the DOE Borrower Subclass Members' benefit, DeVry has interfered with and converted Plaintiffs' and the DOE Borrower Subclass Members' ownership interest in, and right to possess, such funds.

150.    The student loan proceeds Defendants misappropriated are in a specific sum capable of identification. Defendants took Plaintiffs' and the DOE Borrower Subclass Members' loan proceeds from their accounts and converted them to their own use. Defendants willfully interfered with Plaintiffs' and the DOE Borrower Subclass Members' rights to their loan proceeds

with full knowledge that that their conduct was illegal and unlawful. Plaintiffs and the DOE Borrower Subclass Members have been damaged by Defendants' conversion.

151.    Neither Plaintiffs nor the DOE Borrower Subclass Members did discover, or could have discovered with any amount of reasonable diligence, the true facts regarding DeVry's false misrepresentations until, at the earliest, when the FTC Lawsuit was filed against DeVry. Discovery of the true facts did not actually occur, and could not have occurred, until after any applicable statutes of limitation, including the three-year statute of limitations for conversion.

## NINTH CAUSE OF ACTION
### Unjust Enrichment, In the Alternative to Breach of Contract
### (On Behalf of Plaintiffs and the Class)

152.    Plaintiffs and the Class Members incorporate the above allegations as if fully set forth herein, excluding Paragraphs 26–27, 131–37.

153.     The elements of unjust enrichment are: (1) receipt of a benefit; and (2) unjust retention of the benefit at the expense of another. Restitution is appropriate to return the aggrieved party to his or her former position.

154.    In reliance on Defendants' 90% Placement Claim and Higher Income Claim, Plaintiffs and the Class Members conferred non-gratuitous benefits upon Defendants by paying monies and funds to Defendants for products and services that did not have the characteristics, uses, benefits, and attributes which Defendants advertised, promoted, and represented such products and services had, and Defendants derived profits therefrom.

155.    Defendants accepted or retained such benefits with knowledge that Plaintiffs and the Class Members did not know the products and services sold to Plaintiffs and the Class did not have the characteristics, uses, benefits, and attributes which Defendants advertised, promoted, and represented such products and services had. Defendants have been unjustly enriched in retaining the revenues from Plaintiffs' and the Class Members' purchases of DeVry's products and services, which retention under these circumstances is unjust and inequitable because Defendants misrepresented the facts concerning the true characteristics, uses, benefits, and attributes of such products and services.

156.     Plaintiffs and the Class Members would not have purchased DeVry's products and services had they known the characteristics, uses, benefits, and attributes of such products and services were not as Defendants had advertised, promoted, and represented them to be. DeVry was unlawfully inducing Plaintiffs and the Class Members to enroll and pay monies and funds to DeVry for financial gain without their permission or knowledge, and in violation of their consumer rights.

157.     Neither Plaintiffs nor the Class Members did discover, or could have discovered with any amount of reasonable diligence, the true facts regarding DeVry's false misrepresentations until, at the earliest, when the FTC Lawsuit was filed against DeVry. Therefore, Plaintiffs' and the Class Members' claims are any applicable statutes of limitations, including the three-year statute of limitations for unjust enrichment.

158.     As a direct and proximate result of Defendants' false and/or misleading representations, assertions of fact, omissions of material fact, non-disclosures, and illegal conduct, Plaintiffs and the Class Members have suffered concrete harm and injury, including, but not limited to, monetary loss in connection with their purchases of DeVry's products and services, which they would otherwise not have purchased absent Defendants' unlawful conduct, as alleged herein.

159.     Plaintiffs and the Class Members received less than what they paid for in that the 90% Placement Claim and Higher Income Claim were not true, and the DeVry education program was not delivered as promised. Had Plaintiffs and the Class Members known about the misrepresentations and the true placement rate and income rate, they would not have purchased the education program or any products or services from Defendants, or would have paid significantly less for them, if at all.

160.     Under principles of equity and good conscience, Defendants should not be permitted to retain the profits they receive at the expense of Plaintiffs and the Class while failing to have provided them with complete and truthful information regarding the 90% Placement Claim and Higher Income Claim.

161.     Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiffs and the Class Members would be unjust and inequitable. Plaintiffs and the Class

- 37 -

1  Members are entitled to seek disgorgement and restitution of wrongful profits, revenue, and
2  benefits conferred upon Defendant in a manner established by this Court.

3      162.    Plaintiffs and the Class Members are further entitled to, and hereby seek,
4  reasonable attorneys' fees and costs under Cal. Civ. Proc. Code § 1021.5, pre-and post-judgment
5  interest at the applicable legal rate, as well as any and all further equitable relief that this Court
6  deems appropriate.

7  **PRAYER FOR RELIEF**

8      WHEREFORE, Plaintiffs, individually and on behalf of the proposed Classes, request the
9  Court:

10      A.    Certify this case as a class action on behalf of the Class and Subclasses defined
11  above, appoint Dennis Magana, Scott Swindell, and David Torosyan as Class representatives, and
12  appoint Edelson PC and the Law Office of Robert L. Teel as Class Counsel;

13      B.    Award declaratory and other equitable relief, including rescission, as is necessary
14  to protect the interests of Plaintiffs and the Class Members;

15      C.    Find that Defendants breached the terms of their Enrollment Agreement;

16      D.    Award injunctive relief as is necessary to protect the interests of Plaintiffs and the
17  Class Members;

18      E.    Award restitution and damages to Plaintiffs and the Class Members in an amount
19  to be determined at trial;

20      F.    Order disgorgement of Defendants' unjustly acquired revenue, profits, and other
21  benefits resulting from their unlawful conduct for the benefit of Plaintiffs and the Class Members
22  in an equitable and efficient manner determined by the Court;

23      G.    Order the imposition of a constructive trust upon Defendants such that its
24  enrichment, benefit, and ill-gotten gains may be allocated and distributed equitably by the Court
25  to and for the benefit of Plaintiffs and the Class Members.

26      H.    Award Plaintiffs and the Class Members their reasonable litigation expenses and
27  attorneys' fees;

28

I.      Award Plaintiffs and the Class Members pre- and post-judgment interest to the extent allowable; and

J.      Award such other and further relief as equity and justice may require.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.


Dated: August 13, 2019                    **DENNIS MAGANA** and **SCOTT SWINDELL**, individually and on behalf of all others similarly situated

                                          /s/ Rafey S. Balabanian

                                          Rafey S. Balabanian
                                          rbalabanian@edelson.com
                                          EDELSON PC
                                          123 Townsend Street, Suite 100
                                          San Francisco, California 94107
                                          Telephone: 415.212.9300
                                          Facsimile: 415.373.9435

                                          Benjamin H. Richman*
                                          brichman@edelson.com
                                          Sydney M. Janzen*
                                          sjanzen@edelson.com
                                          Michael Ovca*
                                          movca@edelson.com
                                          EDELSON PC
                                          350 North LaSalle Street, 14th Floor
                                          Chicago, Illinois 60654
                                          Telephone: 312.589.6370
                                          Facsimile: 312.589.6378

                                          Robert L. Teel
                                          LAW OFFICE OF ROBERT L. TEEL
                                          lawoffice@rlteel.com
                                          1425 Broadway, Mail Code: 20-6690
                                          Seattle, Washington 98122
                                          Telephone: 866.833.5529
                                          Facsimile: 855.609.6911

- 39 -

*Admission *pro hac vice* to be sought

*Attorneys for Plaintiffs and the Proposed Classes*